**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
**BROOKLYN DIVISION**

| | |
|---|---|
| WATSON CASTELLAN,<br><br>Plaintiff,<br><br>vs.<br><br>TRANS UNION LLC,<br><br>Defendant. | Civil Case No.: 1:26-cv-05386<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Watson Castellan ("Plaintiff") brings this action on an individual basis, against Trans Union LLC, ("Trans Union" or "Defendant") and states as follows:

## INTRODUCTION

1. Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et. seq.

2. More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests. This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data

[1] Victims of Identity Theft, 2018, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant Trans Union acknowledges this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U. S.C. § 1681(a)(4).

12. The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13. Plaintiff's claims arise out of the Defendant Trans Union plainly deficient reinvestigations considering Plaintiff's dispute and notice that he was a victim of identity theft.

14. Accordingly, Plaintiff brings claims against Defendant Trans Union, for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. § 1681c-2.

15. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

**<u>JURISDICTION AND VENUE</u>**

16. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. See 15 U.S.C. § 1681p (FCRA) (permitting

actions to enforce liability in an appropriate United States District Court).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

18. Plaintiff is a natural person residing in Queens Village, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

19. Defendant Trans Union is a corporation with a principal place of business located at 555 West Adams Street, Chicago, IL 60661, and is authorized to do business in the State of New York, including within this District.

20. Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) and is a "person" as defined by 15 U.S.C. § 1681a(b). Defendant Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

21. The information that Defendant Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendant Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

22. The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and

accuracy in the reporting of their credit information.

23. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

24. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

25. Congress also recognized that CRAs such as Defendant Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

26. For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

27. The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a. Appropriate proof of the identity of the consumer;

b. A copy of an identity theft report;

c. The identification of such information by the consumer; and,

d. A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

28. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

29. Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

30. The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendant here.

31. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2] 15 U.S.C. § 1681c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

32. Once placed, a security freeze does not expire. A CRA can remove a security freeze **only** at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A). Furthermore,

[2] Certain statutorily exempt entities can still request and receive a frozen report. See 15 U.S.C. § 1681c-1(i)(4). But those exemptions do not apply to the matter at hand.

when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." 15 U.S.C. § 1681c-1(i)(3)(C).

33. The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may **only** release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

34. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

## FACTUAL ALLEGATIONS

### Plaintiff is the Victim of Identity Theft

35. Plaintiff works as a taxi driver and relies on his driver's license and personal credit profile in his daily life, including for work, financial stability, and ordinary credit-related transactions.

36. On or about June 4, 2024, Plaintiff lost his wallet, which contained his personal identifying information ("PII") and financial items, including but not limited to his Driver's

License, Capital One check book, and various credit, debit, and membership cards.

37. On or about June 5, 2024, Plaintiff immediately submitted an incident report with the 105th Precinct of the New York Police Department ("NYPD") regarding his lost wallet and the contents therein.

38. On or about April 26, 2025, Plaintiff received a written correspondence from non-party Optum Bank concerning the approval of a loan request in the amount of $48,000.00 with the Proceed Finance Loan Program through Nuvia Dental Implant Center – Westbury (the "Fraudulent Optum Bank Loan").

39. Plaintiff was confused, as he had not applied for the Fraudulent Optum Bank Loan and did not authorize anyone to apply for the Fraudulent Optum Bank Loan on his behalf.

40. After receiving the correspondence, Plaintiff contacted Optum Bank to report that he had not applied for the loan.

41. Plaintiff further discovered a fraudulent Capital One account with an account number ending in 7782 which did not belong to him (the "Fraudulent Capital One Account").

42. Plaintiff had not applied for the Fraudulent Capital One Account and did not authorize anyone to apply for the Fraudulent Capital One Account on his behalf.

43. Plaintiff contacted Capital One and informed that the Fraudulent Capital One Account did not belong to him and was the product of identity theft and fraud.

44. Upon information and belief, Capita One began an investigation of Plaintiff's identity fraud claims upon receipt of his direct dispute.

45. On or about May 16, 2025, Plaintiff also received correspondence from non-party GEICO concerning an upcoming payment for $200.00 for an auto insurance policy for a 2022 Kia (the "Fraudulent Insurance Policy").

46. Plaintiff was confused as he had never purchased, financed, registered, possessed, used, or insured a 2022 Kia, nor had he authorized anyone to do so in his name.

47. On or about June 20, 2025, Plaintiff received another notification from GEICO explaining that they were unable to communicate with the email address that they had on file for Plaintiff.

48. Upon information and belief, the email address which GEICO had on file was associated with the Fraudster.

49. On or about July 16, 2025, Plaintiff submitted another police report regarding identity theft and fraudulently opened accounts in his name with the NYPD.

50. On or about July 17, 2025, Plaintiff reached out to GEICO and explained that the Fraudulent Insurance Policy in relation to the 2022 Kia does not belong to him and was the product of identity theft and fraud.

51. Plaintiff further contacted Defendant and placed a credit freeze on his Trans Union credit report and credit file as he feared further fraudulent accounts being opened in his name.

52. On or about July 18, 2025, Defendant contacted Plaintiff and confirmed that a credit freeze had been placed on his Trans Union credit file.

53. On or about July 23, 2025, GEICO responded to Plaintiff by explaining that the Fraudulent Insurance Policy in relation to the 2022 Kia would be cancelled.

54. Encouraged by seeing the fraudulent information removed, Plaintiff further contacted Optum Bank to dispute the Fraudulent Optum Bank Loan directly.

55. On or about Augst 15, 2025, Optum Bank responded to Plaintiff's dispute and informed him that the Fraudulent Optum Bank Loan had been cancelled.

56. Later, on or about November 12, 2025, Capital One completed their investigation

of Plaintiff's fraud claims and informed him that they would close the Fraudulent Capital One Account and cease reporting it to the CRAs.

**Plaintiff Obtains His Credit Reports and Confirms the Reporting of the Fraudulent Information in Plaintiff's Consumer Files**

57. Though the aforementioned fraudulent information had been removed, Plaintiff remained worried about the potential of further fraudulent accounts.

58. To that end, Plaintiff requested copies of his consumer reports from the consumer reporting agencies, including non-parties Equifax and Experian, and Defendant Trans Union.

59. Plaintiff requested his consumer reports to determine whether the unauthorized activity he had been receiving correspondence about was also appearing in his credit files.

60. Upon reviewing his consumer reports, Plaintiff saw accounts, inquiries, and personal identifying information that he did not recognize.

61. Plaintiff was shocked and confused because he had not applied for new credit for many years, and particularly had not applied for credit during the period when the unfamiliar accounts were opened.

62. Specifically, the following unfamiliar accounts appeared in Plaintiff's consumer reports (the "Fraudulent Accounts"):

a. Chime/The Bancorp Bank
Account number: XXXXXXXX6994,
Date opened: March 3, 2025
Balance: $0

b. Bridgecrest
Account Number: XXXXXXX3101
Date opened: April 1, 2025
Balance: $7,990.00

c. Current/CRB
Account Number: XXXXXXX3344

Date opened: May 20, 2025
Balance: $0

d. Klarna BNPL
Account Number: 67ZEXXXXXXXX
Date Opened: July 3, 2025
Balance: $0

63. Plaintiff did not open, use, or receive any benefit from the Fraudulent Accounts, and did not authorize anyone to open any of the Fraudulent Accounts on his behalf.

64. Plaintiff also did not purchase, finance, possess, use, insure, or register the vehicle associated with the fraudulent Bridgecrest account.

65. Plaintiff was particularly concerned about the Bridgecrest account because it was reported as an auto loan in repossession, even though Plaintiff had not obtained an auto loan and had not possessed the vehicle associated with that account.

66. Plaintiff's consumer reports also contained personal identifying information that did not belong to him, including but not limited to addresses, telephone numbers, and Social Security numbers which did not belong to him (the "Fraudulent Identifiers").

67. Plaintiff was panicked, confused, and concerned because the Fraudulent Accounts and Fraudulent Identifiers (collectively the "Fraudulent Information") made it appear that accounts and information belonging to another person, or created through the misuse of his identity, were associated with him.

68. On or about February 10, 2026, Plaintiff submitted an Identity Theft Report with the Federal Trade Commission ("FTC") regarding the Fraudulent Information appearing on his credit reports.

**Plaintiff's Disputes the Fraudulent Information with the Credit Reporting Agencies**

69. Concerned that the Fraudulent Information would continue to appear in his consumer reports, Plaintiff determined that he needed to escalate the issue to the consumer

reporting agencies to prevent further damage to his credit files and reports.

70. On or about February 11, 2026, Plaintiff sent written disputes to non-parties Equifax, Experian and Defendant Trans Union.

71. Specifically, Plaintiff disputed that the Fraudulent Information, stating that it did not belong to him, that he had not applied for credit or loans in years, and that the Fraudulent Information was the product of identity theft.

72. Plaintiff provided sufficient information to identify his credit file and support his claims, including a copy of his driver's license, Social Security card, FTC Identity Theft Report, and the case numbers associated with his two NYPD reports.

73. Plaintiff requested that the identity theft information be blocked and/or removed from his credit files.

74. Plaintiff also attempted to dispute with non-parties Bridgecrest and Chime Financial directly, but was unsuccessful in having the Fraudulent Accounts removed.

75. In response to Plaintiff's dispute, non-parties Equifax and Experian deleted the Fraudulent Information from Plaintiff's credit reports.

**Defendant Trans Union's Dispute Reinvestigation**

76. On or about February 14, 2026, Defendant Trans Union received Plaintiff's dispute and request that identity theft information be blocked and/or removed from his credit file.

77. On or about February 18, 2026, Plaintiff received a response to his February 2026 dispute from Defendant.

78. Specifically, Defendant Trans Union explained that they would not be removing the Fraudulent Information from Plaintiff's credit report.

79. Defendant Trans Union further explained that they would not place a block on

Plaintiff's credit file following his claims of identity theft and fraud.

80. Defendant Trans Union explained that the reason for their refusal to reinvestigate Plaintiff's claims or place a block on his report was because they required more information.

81. Plaintiff was confused, as he had already provided his driver's license, Social Security card, and a copy of the FTC Identity Theft Report in his dispute.

82. Plaintiff had provided sufficient information to support his claims and Trans Union failed to perform a reasonable reinvestigation.

83. Upon information and belief, Defendant Trans Union removed the Fraudulent Identifiers from Plaintiff's credit report, but continues to report the Fraudulent Accounts.

84. Upon information and belief, Defendant Trans Union did remove some of the Fraudulent Accounts from Plaintiff's credit report, but then proceeded to reinsert them afterwards.

85. As of March 24, 2026, Defendant Trans Union continues to report the Fraudulent Accounts on Plaintiff's consumer report.

86. Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff.

87. Defendant Trans Union failed to reinvestigate Plaintiff's February 2026 dispute and failed to block the identity theft information.

88. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, reinserting fraudulent information after having removed it, and failing to recognize that the disputed charges were the product of identity theft.

89. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

**Defendant's Method for Considering Consumer Credit Report Disputes**

90. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

91. The credit bureaus, non-parties Equifax, Experian, Defendant Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

92. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

93. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

94. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

95. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

96. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

97. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

98. Upon receiving a dispute from a consumer, the credit bureaus have an automated

system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

99. The data furnishers, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

100. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff Applies for a Loan with Social Finance in March 2026**

101. Upon information and belief, on or about March 19, 2026, Plaintiff lifted the freeze on his Trans Union credit file.

102. On the same day, Plaintiff submitted an application for a loan with non-party Social Finance ("SoFi").

103. Plaintiff had hoped the loan would ease the financial burdens which arose as a result of being a victim of identity theft and fraud.

104. On or about March 19, 2026, Plaintiff authorized SoFi to review his credit report as part of the application process.

105. On the same day, SoFi purchased and reviewed a copy of Plaintiff's Trans Union credit file, which included the Fraudulent Accounts.

106. As of the filing of this Complaint, Plaintiff has yet to receive a response from SoFi

regarding his loan application.

107. Plaintiff reasonably believes that Defendant Trans Union's reporting of the Fraudulent Account have damaged his chances of acceptance for credit applications.

108. On or about June 8, 2026, Plaintiff ordered a copy of his Trans Union credit report.

109. Plaintiff found that not only had Trans Union sold a credit report to SoFi containing the Fraudulent Accounts, but that Trans Union had also provided credit reports which also included the Fraudulent Accounts to various entities, including but not limited to:

a. Synchrony Bank on or about May 27, 2026, and May 19, 2026;

b. American Express on or about May 1, 2026; and,

c. Capital One on or about March 7, 2026.

110. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

**Plaintiff's Damages**

111. Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft.

112. Plaintiff disputed directly communicated with the furnishers of the fraudulent information, including but not limited to Optum Bank, GEICO, Capital One, Bridgecrest, and Chime Financial.

113. Plaintiff filed two police reports with the NYPD and an Identity Theft Report with the FTC.

114. Defendant Trans Union continued reporting was especially concerning because Plaintiff had disputed those accounts as fraudulent, had identified incorrect personal identifiers associated with the identity theft, and had provided documentation supporting his dispute.

115. Defendant Trans Union failed to delete or block the Fraudulent Accounts that were the product identity theft despite Plaintiff's disputes.

116. Instead, Defendant Trans Union disregarded Plaintiff's credible disputes. Often responding to a victim of identity theft that the furnisher of the account that was the product of identity theft had verified the account as accurate.

117. Defendant Trans Union understand it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

118. Despite Plaintiff's disputes to Trans Union explaining that the Fraudulent Accounts were the product of fraud and he was a victim of identity theft, Defendant hardly waivered in its refusals to remove the same.

119. As a direct result of Defendant Trans Union's ardent refusal to remove the Fraudulent Accounts which were a product of identity theft, Defendant has continued to saddle Plaintiff with Fraudulent Accounts that were the product of identity theft.

120. As a direct result of Defendant Trans Union's ardent refusal to remove the Fraudulent Accounts, which were a product of identity theft, Defendant Trans Union has continued to saddle Plaintiff with the presence of the Disputed Fraudulent Accounts that were the product of identity theft.

121. Plaintiff was particularly distressed by the continued reporting of the Bridgecrest account because it was reported as an auto loan in repossession, with an exceedingly large balance, even though Plaintiff had not obtained the auto loan and had never possessed the vehicle associated with that account.

122. Due to Defendant Trans Union's ardent refusals to comply with its respective

obligations pursuant to the FCRA, Plaintiff spent substantial time and effort trying to correct the inaccurate reporting, including reviewing credit reports, gathering identity theft documents, contacting furnishers, disputing with the consumer reporting agencies, and following up on dispute responses.

123. Plaintiff also suffered harm from the identity theft activity involving the fraudulent car insurance policies, which led to the suspension of Plaintiff's driver's license for more than one month by the DMV.

124. Because Plaintiff works as a taxi driver and relies on his driver's license to earn income, Plaintiff was unable to work during the suspension period and lost income as a result.

125. Plaintiff incurred transportation expenses and other out-of-pocket expenses while traveling to banks, DMV offices, police precincts, and other locations to address the identity theft, DMV issue, and inaccurate reporting.

126. Plaintiff lives with and supports his aunt, and the loss of income placed additional financial pressure on Plaintiff and his household.

127. Furthermore, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

128. Further, and due to Defendant Trans Union's inexplicable refusal to remove the Fraudulent Accounts from an identity theft victim's consumer file, Plaintiff expended countless hours disputing the same with Defendant Trans Union, repeatedly, to no avail.

129. Defendant Trans Union 's conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes.

130. At all times pertinent hereto, Defendant Trans Union was acting by and through

their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

131. At all times pertinent hereto, the conduct of Defendant, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

132. Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendant Trans Union, Plaintiff feels a surge of panic each time he receives another communication from Defendant. His ongoing stress and anxiety regarding the situation has affected him and his relationships negatively.

133. Defendant Trans Union has a long history of disregarding the credit reporting rights of identity theft victims under the FCRA. For example, in the very similar matter of *April Hendrix vs. Equifax, et. al.*, (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including Defendant Trans Union, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

134. The *Hendrix* suit put the Defendant Trans Union on notice several years ago that their respective policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

135. Defendant Trans Union has had years of notice in the form of federal lawsuits, despite it all, has not take any better steps to protect the Plaintiff here.

136. The respective internal policies and procedures of Defendant Trans Union do not appear to place any value on its obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access

to consumers' reports without authorization or permissible purpose. Nor do Defendant Trans Union's respective policies and procedures respect their statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

137. As a standard practice, Defendant Trans Union does not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the data furnishers, despite numerous court decisions admonishing this practice. See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

138. Defendant Trans Union is aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendant Trans Union's violations of the FCRA are willful.

139. Defendant Trans Union's policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

140. As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and

money disputing and trying to remove the Fraudulent Accounts which are the product of identity theft.

141. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Trans Union.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

142. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

143. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

144. On numerous occasions, Defendant Trans Union prepared patently false consumer reports concerning Plaintiff.

145. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

146. As a result of the Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and

money disputing and trying to remove the Fraudulent Accounts which are the product of identity theft.

147. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Trans Union.

148. Defendant Trans Union's conduct, actions, and inactions were willful, rendering Defendant Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

149. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

150. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

151. The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. *Id*.

152. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from

the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

153. In February 2026, Plaintiff disputed the inaccurate information with the Defendant Trans Union and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the Fraudulent Accounts that was the product of identity theft which was a very stressful situation for the Plaintiff.

154. Plaintiff disputed the identity theft information to Defendant Trans Union several times to no avail.

155. On at least one occasion, Plaintiff supported his dispute with a copy of the police report and the FTC ID Theft Report.

156. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Defendant Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

157. Plaintiff expended resources in the form of time and money to repeatedly dispute the same account with the Defendant.

158. Defendant Trans Union's "reinvestigations," were rendered that much more deficient considering their contemporary, Innovis deleted the same disputed information upon Plaintiff's first dispute and certainly in a far more reduced timeline.

159. Defendant Trans Union's repeated refusals to delete the Fraudulent Accounts provided credibility to that account, forcing an identity theft victim to be repeatedly confronted with the evidence of identity theft.

160. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record

the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

161. As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Accounts which are the product of identity theft.

162. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Trans Union.

163. Defendant Trans Union's conduct, actions, and inactions were willful, rendering the Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

164. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681c-2**
**Failure to Block Identity Theft Information**

165. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

166. Defendant Trans Union violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

167. Plaintiff repeatedly submitted ample evidence of the fact that he was an identity theft victim. Plaintiff further supported the fact that he was an identity theft victim by providing to Defendant Trans Union copies of the Police Report and FTC IDT Report.

168. Defendant Trans Union should have blocked the identity theft information but failed to do so at every turn.

169. As a result of the Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Accounts which are the product of identity theft.

170. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendant Trans Union.

171. Defendant Trans Union's conduct, actions, and inactions were willful, rendering the Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

172. Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs and awarding Plaintiff such other and further relief as the Court may deem appropriate and proper.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

Dated: New York,
August 31, 2026

**CONSUMER ATTORNEYS PLLC**

*/s/ Jonathan Krikheli*
Jonathan Krikheli, Esq., NY Bar # 6175988
CONSUMER ATTORNEYS PLLC
68-29 Main Street
Flushing, NY 11367
T: (718) 701-4649
F: (718) 247-8020
E: ykrikheli@consumerattorneys.com

*Attorneys for Plaintiff*
*Watson Castellan*